STATE v. SPAUGH.

(Filed December 10, 1901.)

LICENSES — *Trades* — *Professions* — *Taxation*—*Revenue Acts 1899. Ch. 11, Secs. 51, 71.*

Acts 1899, Ch. 11, Sec. 51, providing that every individual or firm engaged in the business of buying and selling fresh meats from offices, stores, stalls, or vehicles, shall be taxed: *Provided*, that nothing in this section shall apply to farmers vending their own products and without a regular place of business, does not apply to persons who buy cattle, keep them on their farm, and butcher and sell them by retail from a wagon.

INDICTMENT against Arthur Spaugh and J. D. Beckel, heard by Judge *H. R. Starbuck* and a jury, at May Term, 1901, of the Superior Court of FORSYTH County.

These defendants were separately indicted under sections 51 and 71 of Chapter 11, of the Public Laws of 1899. The cases were consolidated by consent, upon motion of the Solicitor. Section 51 of said act is as follows: "On every individual or firm, or his or their agents, engaged in the business of buying and selling fresh meats from offices, stores, stalls or vehicles, an annual license tax as follows: * * * in· cities or towns of less than eight thousand inhabitants, three dollars: *Provided,* that nothing in this section shall apply to· farmers vending their own products and without a regular place of business."

Section 71 prescribes the penalty. The entire evidence is as follows:

"The State introduced E. A. Ebert, Deputy Sheriff of Forsyth County, who testified that in December, 1900, the defendant applied to the Sheriff of Forsyth County for license to buy and sell fresh meats in the town of Salem, a municipal corporation of the State of North Carolina of less than

eight thousand inhabitants.   That he issued license to the
defendants, as partners, trading as Beckel & Spaugh, in De-
cember, 1900, and dated it back to September 1, 1900,
at their request.

· "That witness had purchased fresh meats of the defendants,
trading as Beckel & Spaugh, but that it was during other ·
times when they had license.   That he did not buy any meats
of them during the period embraced between September 1,
1900, and December 1, 1900, but defendants stated to witness
they did not sell during that period.   Witness testified that
the defendants were both farmers, but witness did not know
whether the fresh meats sold was produced from defendants'
own farm or not.

"L. A. Breitz, witness for the State, testified that he bought
fresh meats at different times and frequently from the defend-
ants, who were partners, sometimes on foot and sometimes
dressed.   That they were both farmers and owned their farms.
He had been to their homes.

"State here rested.

"And defendants introduced defendant Beckel, who testi-
fied that witness and his co-defendant traded sometimes as
partners and sometimes individually, in the business of buy-
ing, butchering and selling beef cattle.   That in the spring
of 1900, witness and co-defendant purchased a number of
cattle, some of them calves in poor condition; that they took
them to their farms, where they lived, grazed and fattened
them on their farms.   And that during the months of Sep-
tember, October and November, 1900, they sold out these
cattle, some by wholesale, some they butchered and sold by
retail from their wagons in the city of Salem.   But that
during the months of September, October and November,
1900, they sold no other fresh meats in the city of Salem,
except what they raised on their farms, and those they pur-

chased in the spring of 1900 and grazed and fattened on their own farms, and these they bought for the purpose of grazing, fattening, butchering and selling.

"That they sold no fresh meats without license by retail except during the months of September, October and November, 1900, and that these fresh meats were of cattle from their farms, as before stated."

The defendants here rested their case, and asked his Honor to charge the jury that, if they believed the evidence, they should render a verdict of not guilty, as defendants were indicted under Chapter 11, Public Laws 1899, sec. 51, and, being farmers, the meat sold, according to the testimony, was produced on their own farms, and the defendants were expressly exempt in said section.

His Honor refused to give this instruction, but charged the jury that, if they believed the testimony, they must find the defendants guilty. From a verdict of guilty and judgment thereon, the defendants appealed.

*Brown Shepherd,* for *the Attorney-General,* for the State.
*Jones & Patterson,* for the defendants.

Douglas, J., after stating the facts. We think there was error in the charge of his Honor. The evidence was practically without contradiction, and the defendants should have been acquitted if the jury believed their evidence, which fully brought them within the exception, if, indeed, the burden of proof rested upon them. The State contends (1) that the word "product," as applied to a farm, does not include live stock; and (2) that if it does include live stock, it applies only to such as were "produced" or dropped upon the farm, natives, so to speak.

Whatever may be the strict meaning of the word, it is evident that the Legislature intended to include fresh meats, for the simple reason that it used the word in a section which,

by its very terms, applied solely to fresh meats.   Any other construction would deprive the proviso of any meaning whatever.

The second contention is equally untenable, considering either the letter of the law or its essential purposes. . If a farmer, and we use this word in the sense of an occupation and not a class, finds it more profitable to turn his corn and grass into meat, it makes no difference to him whether a calf is dropped on his farm or on that of someone else.   What he wants is the calf, and he wants it at once.   He may have more feed than stock, and may find it impossible to dispose . of his surplus provender even at the cost of production.   If he happens to raise an unusually good crop of corn, it is quite likely that his neighbors have done the same thing, and therefore corn will be cheap.   To compel him to haul it to a distant market, there to come in competition with Western corn, or to await the slow process of "producing" a calf to eat it, can not be within the intention of the law..

Moreover, we think there is, as contended by defendants' counsel, a broad view of public policy underlying this provision of the statute, applying to the community as well as to the individual.   It is to encourage the general raising of live stock by the small farmer, which will not only be profitable to the individual, but add to the aggregate wealth of the community, and tend to preserve and increase the fertility of its lands.   In this view of the law it makes no difference where the calf was dropped, as its principal value is in raising it, owing to its two distinctive qualities of converting an unmarketable crop into one more marketable and of greater value; and at the same time giving back to the land the greater part of what has been taken from it.

One drawback in the raising of beef cattle at a distance from the large cities is the difficulty of disposing of it in bulk, or of preserving it for home consumption. Therefore, the

law leaves his home market open to the producer.   With our
increasing tendency to small farms, and the absolute necessity
for the average farmer to raise enough for his own support,
with a little surplus to exchange for those things he can not
raise, it is essential that that surplus should find a ready
market where it will not be eaten up by the cost of transporta-
tion or absorbed by the want of competition.   Hence, the
Legislature has confined the exemption to farmers, not be-
cause they are in a sense a privileged class, for we have no
privileged classes in this country, but because they are the
only class whose occupation brings them within the reason of
the law.   Hence, we do not see why a market gardener who
should raise a calf or a hog on the waste products of his land,
should not be equally entitled to kill it and peddle out the
product.

.  And yet this must be done in good faith, which, if disputed,
would be largely a question of fact.   A man whose principal
occupation is that of a butcher can not claim this privilege
simply by buying or renting a few acres of land to be used
as fattening pens in furtherance of his regular business of
a butcher.   In such a case, the beeves would be his own pro-
ducts only to the extent of the few extra pounds of flesh he put
on them. What this law contemplates is that the meat in its es-
sential character must be the product of the land owned or
worked by the man who seeks to peddle it.   There is a singular
dearth of authority on this subject.   The case most nearly
in point seems to be that of *Trustees of Rochester v. Pettin-
ger,* 17 Wendell, 265, decided in 1837.   There the Court
says, on page 266: "Now, if the farm was in fact used and
occupied as a convenient and profitable appendage to another
calling, to-wit, the business of butchering, and was not occu-
pied and cultivated as a farm in the ordinary mode of farm-
ing, in the common and popular acceptation of the term, he
could not be considered as coming within the exception.   He
would occupy it, *not as a farmer,* but *as a butcher,* with the

STATE *v.* SPAUGH.

view the better to promote his business in that line. The plain object of the ordinance was, while it protected *licensed butchers,* to allow *farmers* to come in and sell the produce of their farms." The defendants here appear to live on their farm, and to be farmers in the truest acceptation of the term, as their regular occupation is farming, although they may occupy some of their spare time dealing in fresh meats. When they have done so, they have paid the tax; but that does not deprive them of the right to sell the product of their own farms without tax.

We have carefully considered this case, because it involves a principle of general importance, which it seeks to determine. Counsel frankly stated that this was their object, which is apparent from the record, as we can scarcely suppose that able lawyers would be employed to carry a case through all the Courts to that of last resort for the simple purpose of avoiding the payment of a single license tax of three dollars.

For error in the direction of his Honor, there must be a new trial.

New Trial.